56 CCPA

**Application of Guenther K. HOESCHELE.**
**Patent Appeal No. 8118.**

United States Court of Customs and Patent Appeals.
March 6, 1969.

---

Francis A. Paintin, Wilmington, Del. (James T. Corle, Wilmington, Del., of counsel), for appellant.

Joseph Schimmel, Washington, D. C. (Jack E. Armore, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, ALMOND and BALDWIN, Judges.

ALMOND, Judge.

This is an appeal from the decision of the Patent Office Board of Appeals affirming the final rejection of claims 1, 3, 4 and 5,[1] the sole claims of appellant's application.[2]

The invention relates to polyurethane elastomers said to have improved freeze-resistant properties. It is said that polyurethane elastomers prepared from polytetramethylene ether glycol (hereinafter PTME glycol) or polypropylene ether glycol (hereinafter PPE glycol) are unsatisfactory for many applications on industrial equipment which may be subjected to extremely low temperature, as in winter operation, because the former tends to crystallize and become hard upon prolonged exposure to low temperature while the latter, although evidencing less tendency to crystallize, is too stiff and lacks sufficient resilience, toughness and moisture resistance.

Appellant's invention allegedly provides polyurethane elastomers which exhibit strength and resilience and which remain soft for protracted periods at low temperature. The invention, the essence of which is said to reside in the use of specific mixtures of PTME glycol and PPE glycol, is set forth in claim 1 which is illustrative:

1. A polyurethane elastomer exhibiting improved freeze resistant properties prepared from (1) about 15 to 50 percent by weight of the total glycol of a polypropylene ether glycol having an average molecular weight of about 900 to 4000, (2) about 85 to 50 percent by weight of the total glycol of a polytetramethylene ether glycol having an average molecular weight of about 1800 to 3000, (3) an isocyanate selected from the group consisting of toluene–2, 4–diisocyanate and mixtures of toluene–2, 4–diisocyanate and toluene–2, 6–diisocyanate, and (4) an arylene diamine having a pKb of at least 9.7 and having both amino radicals directly attached to the aromatic nucleus, with the proviso that said isocyanate be present in stoichiometric excess to provide from about 0.5 to 1.25 moles of excess diisocyanate per mole of glycol, and said arylene diamine be present in an amount to provide about 0.85 to 1.05 mole of said diamine per mole of said stoichiometric excess diisocyanate.

Claims 3 and 4, drawn to the same subject matter as claim 1, recite specific proportions and average molecular weights of the glycols, specify a mixture of diisocyanate and recite a specific diamine.

---

1. Claim 5, actually presented after the final rejection and entered by the examiner, constitutes finally rejected claim 2 rewritten in Jepson form "to afford the Board of Appeals an opportunity to judge whether or not this type of claim more particularly points out the invention."

2. Serial No. 230,688 filed October 15, 1962 for "Chemical Products."

Claim 5, presented in Jepson form and stating the improvement to be in employing a mixture of PPE glycol and PTME glycol within the stated range of proportions and average molecular weight, is narrower than claim 1 with respect to the range of proportions of glycols.

The references relied upon are:

| | | |
|---|---|---|
| Gladding et al. (Gladding) | 2,917,489 | December 15, 1959 |
| Hill | 2,929,800 | March 22, 1960 |
| Gmitter | 3,078,239 | February 19, 1963 |

Gladding discloses polyurethane elastomers having improved tear strength prepared from polyalkylene ether glycols, an organic diisocyanate such as toluene 2, 4–diisocyanate, and an active hydrogen-containing organic compound which may be an arylene diamine such as 4, 4′ –methylene-bis-(2–chloroaniline). PTME glycol is preferred and the molecular weight is stated to be 750 but not greater than 6000. The preferred amount of organic compound to be used is said to be such that its reaction with 70 to 90 per cent of the free isocyanate groups is obtained; specific examples using diamine employ only enough to provide 80 per cent.

Hill discloses polyurethanes produced from polyalkylene glycols having molecular weights of 750 to 3500, such as PPE glycol or preferably PTME glycol, an organic diisocyanate including 2, 4–tolylene diisocyanate, and a chain-extending agent which is a compound containing a plurality of active hydrogen atoms. Listed among thirty-five such agents said to be useful are water and three arylene diamines. The reference states that instead of using only a single diisocyanate, polyalkylene ether glycol, or chain extender, mixtures of two or more of each type of compound may be employed. The elastomers are said to have excellent resistance to heat and cold, a low brittle point and to be particularly useful for fabricating articles to be used at low temperature, such as -20° C.

Gmitter discloses the preparation of polyurethane foams and specifically shows a 72/28 mixture of PTME and PPE glycols in conjunction with a mixture of 2, 4– and 2, 6–toluene diisocyanate. The excess diisocyanate per mole of glycol is about 4.4 and water is used as the chain-extension agent. The amount of water is said to be dependent to some extent upon the characteristic of the foam desired. The reference also states that properties of the foamed material may be predesigned and changed so as to alter the properties of the final product such as the resiliency and flexibility at lower temperatures.

The examiner rejected the claims, apparently under 35 U.S.C. § 103, and the board affirmed that rejection, reasoning as follows:

\* \* \* [we] find ourselves in agreement with the Examiner in holding the appealed claims to be unpatentable over Gladding et al. taken with Hill and Gmitter. In view of the knowledge in the art represented by Hill of the employment of mixtures of polyalkylene ether glycols in the formation of polyurethanes it would be obvious to the polymer chemist to employ mixtures of the polyglycols disclosed in Gladding et al. Since Gmitter teaches the formation of polyurethanes from mixed polypropylene glycol and polytetramethylene ether glycol in proportions within the range herein claimed, the employment of such ratio of glycols in the Gladding et al. contribution is rendered obvious to the chemist. \* \*

Any argument by appellant based upon the fact that Gmitter employs the different polyglycols in a polyurethane foam is not significant since the art is well aware of the manner of

producing or of preventing the formation of foams as desired. Compare Hill * * *.

*   *   *   *   *   *

While we have held the combination of references relied upon by the Examiner to render obvious appellant's contribution, as claimed, it is also to be noted that the argued freeze resistant properties are not unexpected where the art suggests mixture of reactants be employed. Such a mixture would necessarily produce a mixture of products and it is well known that crystallization is prevented by the presence of impurities and, hence, improved freeze-resistance is to be expected in a mixture as compared with the single separate components thereof.

Appellant admits that the elastomeric polyurethanes of his invention fall within the broad scope of both Gladding and Hill; however, he contends that the references are sufficiently broad as to require a number of additional selections both as to ingredients and their ratios or proportions before one would obtain his invention as defined in the claims. Appellant questions, by way of examples, why one would select particular claimed reaction ingredients and proportions from the broad disclosure, and further states that by employing specific ingredients and proportions he has provided elastomers possessing all the desirable properties.

■ We are not persuaded by this line of reasoning. The teachings of the references encompass the invention defined by the claims yet there is no evidence in the record pointing to any critical significance in the claimed molar proportions or ranges of molecular weight. See In re Moreton, 295 F.2d 945, 49 CCPA 760; In re Eisenhut, 245 F.2d 481, 44 CCPA 974. Nor is there a showing that the other chain extenders mentioned would not work as well as the expressly disclosed arylene diamine. It is well established that an arguable difference where comparative evidence is clearly needed is not convincing. In re Fortess, 369 F.2d 1009, 54 CCPA 889.

Appellant, while acknowledging that Gmitter employs the same mixture of glycols, attempts to distinguish the reference primarily on the basis that water rather than an arylene diamine is used as a chain extender. We do not consider that fact to render Gmitter inappropriate as a reference in the rejection. A consideration of Gmitter and Hill in their entireties would suggest to one skilled in the art that an organic chain extender may replace water for desired effect such as avoidance of a porous product. Furthermore, Gmitter is relied upon to show that the recited glycol *proportions* are known for polyurethane elastomers generally.

Appellant argues, however, that his invention is patentable because he achieved an unexpected improvement in long-term freeze resistance. In support of this argument, appellant directs our attention to a table in the specification showing that polyurethane elastomers containing a mixture of PPE and PTME glycols show no substantial increase in hardness over a period of up to as long as forty days when held at -20°C., whereas the elastomers containing only PTME glycol or only PPE glycol show increases of approximately 25 and 13 per cent, respectively. None of the references, it is said, ever mentions the problem of long-term freeze resistance, nor how such a property might be improved.

We find this argument unconvincing. Hill states that an object of his invention is to produce molded articles which do not become brittle at low temperatures, and expressly discloses that "they are particularly useful for fabricating articles to be used at low temperatures, such as -20° C." Included among the articles produced are tires, inner tubes, belts and wire and cable jackets.

■ Gmitter speaks of altering the properties of the final product such as resiliency and flexibility at low temperatures. In considering the above disclo-

sures, it is proper to take into account not only specific teachings of the references but also the inferences which one skilled in the art would reasonably be expected to draw therefrom, In re Preda, 401 F.2d 825, 56 CCPA ——; In re Shepard, 319 F.2d 194, 50 CCPA 1439. We are of the opinion that the skilled artisan would reasonably infer that the patentees are suggesting that in following their disclosures one would obtain improved freeze resistance. To argue that this is not intended to mean long-term freeze resistance is to ignore what is implicit in the disclosure because of the obvious use to which the well-known products are put. Not only does the prior art suggest the use of a mixture of glycols but the results obtained thereby do not appear to be entirely unexpected.

We have considered appellant's arguments and the cases cited in support thereof; however, we are not persuaded that the board erred in concluding that the claims on appeal are obvious in view of the cited references.

The decision is affirmed.

Affirmed.